## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| Ovetta Reid, | |
| Plaintiff, | Civil No. 3:25-cv-00997 (KAD) (TOF) |
| v. | |
| Arnaud Lokay et al., | December 9, 2025 |
| Defendants. | |

### RULING ON MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* AND RECOMMENDED RULING ON INITIAL REVIEW OF THE COMPLAINT UNDER 28 U.S.C. § 1915

This is a lawsuit filed by a *pro se* plaintiff, Ovetta Reid, against a car dealership and one of its salespeople. At bottom, Ms. Reid is unhappy with the terms of a contract that she signed when she purchased a 2019 Hyundai Sonata from Seaview Motors and Repair, LLC ("Seaview") and its agent, Arnaud Lokay.[1] Under those terms, Ms. Reid made a down payment of $2500.00 and was obligated to pay $678.26 per month for seventy-two months, resulting in a total cost of $51,334.72 for the automobile.[2] A portion of that amount was for "GAP insurance" underwritten by Phoenix American Administrators, Inc., also for a term of seventy-two months.[3] On August 11, 2022, the date of sale, Seaview immediately assigned the contract to Credit Acceptance Corporation, and Ms. Reid was directed to make all payments to that company at its Michigan address.[4]

---

[1]     Complaint, Docket No. 1, at p. 1.
[2]     Complaint, Docket No. 1, at p. 2.
[3]     Complaint, Docket No. 1, at p. 3.
[4]     Complaint, Docket No. 1, at p. 5.

There things stood until May, 2025, when Ms. Reid wrote two letters to Seaview and Mr. Lokay, claiming that they had breached the contract and violated various federal laws.[5]  In the first letter, dated May 21, 2025 ("May 21 letter"), Ms. Reid announced her intention to seek rescission of the contract and to return the automobile to Seaview.[6]  She also demanded arbitration and the return of her $2500.00 down payment.[7]  In her second letter, dated May 26, 2025 ("May 26 letter"), Ms. Reid put forward similar allegations, also stating that Seaview had "willingly and knowingly" taken advantage of her credit rating during the negotiation for the contract, having deceptively informed her that "a down payment of $2500 was needed for [her] to drive off the lot."[8]  She did not receive a response to either letter.[9]

Ms. Reid then filed a complaint in this Court,[10] along with a motion for leave to proceed "*in forma pauperis*," or "IFP."[11]  "*In forma pauperis*" is a Latin phrase meaning "in the form of a pauper," and plaintiffs who show that they are entitled to proceed that way may begin a lawsuit without paying the customary filing fees.[12]  But a successful IFP motion "comes with a consequence."[13]  "To ensure that plaintiffs do not abuse the privilege of filing a free lawsuit, a federal law instructs district courts to review IFP complaints and dismiss them if they are frivolous or malicious, fail to state a claim, or seek relief from someone who is immune."[14]  The assigned

---

[5]     Complaint, Docket No. 1, at pp. 17-18.
[6]     Complaint, Docket No. 1, at p. 17.
[7]     Complaint, Docket No. 1, at p. 17.
[8]     Complaint, Docket No. 1, at p. 18.
[9]     Complaint, Docket No. 1, at p. 1.
[10]    Complaint, Docket No. 1.
[11]    IFP Motion, Docket No. 2.
[12]    28 U.S.C. § 1915(a).
[13]    *Ortiz v. Tinnerello*, No. 3:22-cv-1318 (AWT) (TOF), 2023 WL 11842871, at *1 (D. Conn. Mar. 22, 2023), *report and recommendation approved and adopted*, slip op. (D. Conn. July 26, 2025).
[14]    *Ortiz*, 2023 WL 11842871, at *1 (citing 28 U.S.C. § 1915).

District Judge, the Hon. Kari A. Dooley, therefore referred Ms. Reid's case to me—Magistrate Judge Thomas O. Farrish—to determine whether Ms. Reid is entitled to IFP status and, if so, whether her case should proceed or be dismissed.

I have carefully studied Ms. Reid's complaint, the contract that she attached to it, and her IFP motion. Having done so, I conclude that she is entitled to proceed IFP, and I will therefore grant her motion for the reasons explained in Section I below. But I also conclude that her complaint fails to state a claim upon which relief may be granted, for the reasons explained in Section II. I will accordingly recommend that Judge Dooley dismiss the complaint, without prejudice to an amended complaint meeting the requirements of Rule 8 of the Federal Rules of Civil Procedure.

## I.    *IN FORMA PAUPERIS* MOTION

In the first step of the required analysis, I will address whether Ms. Reid qualifies for IFP status. Plaintiffs must ordinarily pay $405.00 to start a civil lawsuit in the United States District Court for the District of Connecticut, composed of a $350.00 filing fee and a $55.00 administrative fee.[15] A plaintiff may have those fees waived, however, if she files an affidavit showing that she is "unable to pay such fees or give security therefor."[16]

To qualify as "unable to pay," the plaintiff does not have to demonstrate absolute destitution,[17] but she does need to show that "paying such fees would constitute a serious hardship."[18] The United States Supreme Court has said that a plaintiff makes a "sufficient" showing of inability to pay when her application demonstrates that she "cannot because of [her]

---

[15]    28 U.S.C. § 1914; 28 U.S.C. § 1915(a).
[16]    28 U.S.C. § 1915(a).
[17]    *Potnick v. E. State Hosp.*, 701 F.2d 243, 244 (2d Cir. 1983) (per curiam).
[18]    *Fiebelkorn v. United States*, 77 Fed. Cl. 59, 61 (2007).

poverty pay or give security for the costs and still be able to provide [her]self and [her] dependents with the necessities of life."[19]

In her motion to proceed IFP, Ms. Reid says that she has little income and few assets. She states that she does not own any real property; does not own any automobiles; does not have any cash on hand; and does not own any stocks, bonds, or other investment instruments.[20] She also represents that she has no job, having been unemployed since March, 2023, due to an epilepsy diagnosis.[21] She further states that she receives $640.00 per month in child support, having an eight-year-old daughter to care for, and that her monthly expenses are $790.00.[22] Although the Court may also consider the available resources of Ms. Reid's family members in assessing her eligibility for IFP status,[23] she has indicated on her affidavit that she is living with a parent and has "no access to [the parent's] funds/resources."[24]

Given her lack of resources, Ms. Reid qualifies for IFP status. Paying the $405.00 would detract from her ability to provide the necessities of life for herself and her daughter, thus constituting a serious hardship. I will therefore grant her IFP motion.

---

[19] *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948).

[20] Despite reporting in her affidavit that she owns no automobiles, Ms. Reid also asserts in her complaint that she purchased a 2019 Hyundai Sonata—the automobile that is at the heart of this lawsuit, and for which she is still paying. Including her ownership interest in the "hardship" analysis does not change the result, because Ms. Reid clearly still has few liquid assets and little income. But Ms. Reid is respectfully advised that she must be truthful and complete in all court filings, and that failure to do so may subject her to penalties.

[21] IFP Motion, Docket No. 2, at p. 6.

[22] IFP Motion, Docket No. 2, at pp. 4-6. This sum includes $120.00 per month for her cell phone bill and $670.00 per month for her car payment.

[23] *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 537 (S.D.N.Y. 2002).

[24] IFP Motion, Docket No. 2, at p.4.

II.    **REVIEW OF THE COMPLAINT UNDER 28 U.S.C. § 1915**

A.    **Legal Principles Governing Section 1915 Review**

As noted above, the granting of Ms. Reid's IFP motion "comes with a consequence."[25] Because IFP plaintiffs lack "an economic incentive to refrain from filing frivolous, malicious or repetitive lawsuits,"[26] a law known as 28 U.S.C. § 1915 instructs federal district courts to review their complaints and dismiss certain types of plainly unmeritorious claims.

More specifically, 28 U.S.C. § 1915(e)(2)(B) instructs federal district courts to dismiss complaints filed by IFP plaintiffs if any of three circumstances apply.  First, the complaint must be dismissed if it is "frivolous or malicious."  Second, the complaint is likewise subject to dismissal if it "fails to state a claim on which relief may be granted."  Third, the Court should dismiss the complaint if it seeks money damages from a defendant who is immune from such a claim.[27]  And a complaint of course must be dismissed if the plaintiff's claim is outside the court's jurisdiction— that is, if it is the sort of claim the court is not empowered by law to hear.[28]

The second of these circumstances is particularly relevant in this case, so I will explain it in more detail for Ms. Reid's benefit.  A complaint fails to state a claim when it does not include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[29] "Facial plausibility," in turn, requires the pleading of "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[30]  And "the complaint must include sufficient facts to afford the defendant fair notice of the claims and the

---

[25]    *Ortiz*, 2023 WL 11842871, at *1 (citing 28 U.S.C. § 1915).
[26]    *Neitzke v. Williams*, 490 U.S. 319, 324 (1989).
[27]    28 U.S.C. §§ 1915(e)(2)(B)(i-iii).  The immunity prong of this test is not relevant here.
[28]    *See Yong Qin Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010) (per curiam).
[29]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[30]    *Ashcroft*, 556 U.S. at 678.

grounds upon which they are based and to demonstrate a right to relief."[31]  Put simply, a plaintiff's complaint must include enough factual allegations to plausibly add up to a legally meritorious claim, if one assumes those allegations to be true.  Of course, the plaintiff will have to prove her allegations later in the case.  But at this early stage, the Court reviews the plaintiff's factual claims, assumes that she will ultimately be able to prove them, and asks itself whether they would add up to a valid legal claim if she were to do so.

Importantly, the Court only assumes the truth of the plaintiff's *factual* allegations; it does not assume the truth of her "conclusory" claims.[32]  A "conclusory" allegation is one that "express[es] a factual inference without stating the underlying facts on which the inference is based."[33]  In a car accident case, for example, "the defendant ran the red light and struck me and broke my leg" would be a factual allegation.  By contrast, it would be conclusory to say only "the defendant was negligent," without additional facts.  In deciding whether an IFP plaintiff's case should proceed past this early stage, the Court assumes the truth of her factual allegations but not her conclusory allegations.[34]

These and other legal rules are applied liberally in favor of *pro se* plaintiffs like Ms. Reid.  Because the law "is not meant to be a series of traps and travails" for *pro se* litigants, and because it does it aim "to dismiss potentially meritorious arguments because of the particularities of federal practice," *pro se* litigants are given a "special solicitude" that often "consists of liberal construction

---

[31]      *Arpino v. Spera*, No. 3:22-cv-01114 (KAD) (TOF), 2022 WL 21751856, at *3 (D. Conn. Sept. 22, 2022) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)), *report and recommendation approved and adopted,* slip op. (D. Conn. Nov. 9, 2022).
[32]      *Ashcroft*, 556 U.S. at 678.
[33]      Black's Law Dictionary (8th ed. 2004) at p. 308.
[34]      *Ashcroft*, 556 U.S. at 678.

of pleadings [and] motion papers[.]"[35]  In essence, complaints submitted by parties who are unrepresented by an attorney are not scrutinized in the same manner as those submitted by a licensed attorney.  "Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements," courts must "construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel."[36]

One way courts express this flexibility is by not limiting their review to the legal theories that the plaintiff expressly named in her complaint.  Because *pro se* plaintiffs "cannot be expected to know all of the legal theories on which they might ultimately recover,"[37] courts should consider not only whether the plaintiff's factual allegations add up to a valid claim under the theory that the plaintiff identified.  Rather, they should also consider whether those allegations "add up to some plausible claim that she did not think of.[38]  In the case of *Emiabata v. Bartolomeo*, for example, a *pro se* plaintiff unsuccessfully attempted to plead a claim under six different legal theories.  But his factual allegations suggested a seventh theory that he had not thought of, and the Court allowed his case to proceed under that theory.[39]

All this flexibility has limits, however.  First and foremost, even a *pro se* plaintiff must plead enough facts to plausibly state a claim upon which relief can be granted.  As Judge Covello

---

[35]     *Rosa v. Doe*, 86 F.4th 1001, 1007 (2d Cir. 2023) (citations omitted; internal quotation marks omitted).
[36]     *Lerman v. Bd. of Elections*, 232 F.3d 135, 139-40 (2d Cir. 2000).
[37]     *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005).
[38]     *Murphy v. PHH Mortg. Servicers*, No. 3:23-cv-1552 (KAD) (TOF), 2024 WL 2864218, at *3 (D. Conn. Jan. 23, 2024), *report and recommendation approved and adopted*, slip op. (D. Conn. May 15, 2024).
[39]     *Emiabata v. Bartolomeo*, No. 3:21-cv-776 (OAW) (TOF), 2022 WL 4080348, at *10-11 (D. Conn. Jan. 3, 2022), *report and recommendation approved and adopted*, slip op. (D. Conn. Jan. 31, 2023).

once wrote, "[a]lthough courts still have an obligation to liberally construe a *pro se* complaint," the complaint "must include sufficient factual allegations to meet the standard of facial plausibility."[40]  Second, in determining whether the plaintiff has pled enough facts, courts cannot fill holes in her complaint by "invent[ing] factual allegations that [s]he has not pled."[41]  Third, while a *pro se* complaint is entitled to a liberal construction, "that liberality does not stretch so far as to cause a court to hear a case that is outside its jurisdiction."[42]  "Where jurisdiction is lacking . . . dismissal is mandatory."[43]

In Section II.B below, I will address the legal theories that Ms. Reid thought to name, and I will consider whether her factual allegations add up to a legally meritorious claim under those theories.  In Section II.C, I will identify some legal theories that Ms. Reid might also have attempted, given her factual allegations.  As will be shown, however, Ms. Reid has not yet pled enough facts to add up to a valid claim under any identifiable legal theory.

**B.**     **Claims Under Legal Theories Expressly Identified by Ms. Reid**

*1.     Claims under federal criminal statutes*

Ms. Reid thinks the defendants acted criminally, and she seeks to hold them liable under the federal criminal laws.  Specifically, she asks the Court to "acknowledge" the "crimes" of the defendants because she believes that the defendants' actions "constitute a federal offense."[44]  She claims that the defendants violated the federal mail fraud statute, 18 U.S.C. § 1341, when they

---

[40]     *Vega v. Univ. of Conn. Med. Ctr.*, No. 3:11-cv-1864 (AVC), 2012 WL 1825381, at *1 (D. Conn. May 16, 2012).
[41]     *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).
[42]     *Hamm v. Baio*, No. 3:22-cv-401 (OAW) (TOF), 2023 WL 2867070, at *2 (D. Conn. Jan. 10, 2023), *report and recommendation adopted*, slip op. (D. Conn. Feb. 27, 2023).
[43]     *Yong Qin Luo*, 625 F.3d at 775 (internal quotation marks omitted).
[44]     Complaint, Docket No. 1, at p. 1.

"rolled [her] downpayment into [her] finance charge" and "fraudulently" took her "cash downpayment for financial gain."[45]

The law is clear, however, that "private citizens cannot prosecute criminal actions in federal court."[46]  As the Supreme Court put it over fifty years ago, "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."[47]  Plaintiffs "also cannot direct prosecuting attorneys to initiate a criminal proceeding because prosecutors possess discretionary authority to bring criminal actions, and they are 'immune from control or interference by citizen or court.'"[48]  Thus, to the extent that Ms. Reid is attempting to initiate a criminal case against Seaview or its employee, that attempt is "frivolous" and "fails to state a claim."[49]

The law is equally clear that a plaintiff cannot base a civil case on a federal criminal statute under the circumstances present here.  Most federal criminal laws are enforced exclusively by the United States Government in a criminal prosecution; they are not typically enforced by private parties in civil damages lawsuits like this one, unless there is a reason to suppose that "Congress specifically intended to create a private right of action."[50]  The mail fraud statute is one of the many federal criminal laws that cannot, by itself, serve as a vehicle for a private damages lawsuit.[51]  Moreover, even if the mail fraud statute had provided for enforcement by private plaintiffs like Ms. Reid, she has not plausibly alleged that the defendants violated it.  18 U.S.C. § 1341 pertains

---

[45]    Complaint, Docket No. 1, at p. 17.

[46]    *Genao v. St. Nicholas Hous. Dev.*, No. 19-cv-2477 (CM), 2019 WL 2225752, at *1 (S.D.N.Y. May 22, 2019).

[47]    *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

[48]    *Genao*, 2019 WL 2225752, at *1 (quoting *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972)).

[49]    *Murphy*, 2024 WL 2864218, at *3 (internal quotation marks omitted).

[50]    *Hill v. Didio*, 191 F. App'x 13, 14 (2d Cir. 2006) (summary order).

[51]    *Pharr v. Evergreen Garden, Inc.*, 123 F. App'x 420, 422 (2d Cir. 2005) (summary order) ("The law in this circuit is clear that [18 U.S.C. § 1341] does not support any private right of action.").

to the use of the Postal Service in the perpetration of a scheme involving "counterfeit or spurious coin, obligation, security, or other article," but Ms. Reid does not allege that the mail was used in any way during her purchase of the Hyundai. Thus, even if Ms. Reid intended to start a civil suit based on the mail fraud statute, rather than a criminal prosecution, that claim would fail.

### 2.    *Claim for rescission under the Truth in Lending Act, 15 U.S.C. § 1635*

Ms. Reid seeks to rescind the contract for the purchase of her Hyundai. Her May 21 letter had an "re:" line reading "RECESSION OF CONTRACT ESTABLISHED 08/11/2022,"[52] and in the body of the letter, she stated that she "would like to rescind this contract and return the automobile as [she] was clearly coerced into signing over [her] security interests to your company."[53] The May 26 letter similarly had an "re:" line reading "Right of Recission," and in it, Ms. Reid specifically invoked the rescission provision of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635.[54] In this lawsuit, she asks the Court to "provide [her] with the relief" she sought in those letters, presumably including rescission under Section 1635.[55]

Ms. Reid has, however, failed to state a claim under that section, for two principal reasons. First, this statute is inapplicable because it pertains to contracts that create a security interest in "property which is used as the principal dwelling of the person to whom credit is extended."[56] Subsection (b) refers to this right to rescind, and what happens when an obligor exercises her right to rescind in situations in which a security interest has been "retained or acquired" in the property that the obligor uses as a principal dwelling place—i.e., a home.[57] In this case, Ms. Reid has not

---

[52]    Complaint, Docket No. 1, at p. 17.
[53]    Complaint, Docket No. 1, at p. 17.
[54]    Complaint, Docket No. 1, at p. 18.
[55]    Complaint, Docket No. 1, at p. 1.
[56]    15 U.S.C. § 1635(a).
[57]    15 U.S.C. § 1635(b).

alleged that the purchase of the 2019 Hyundai Sonata created a security interest on the part of her creditors in her home. To the contrary, the documents she has provided to the Court clearly establish that Ms. Reid purchased her car in the usual way—via installment contract creating a security interest the car, not in her house. Therefore, she has not stated a plausible claim under 15 U.S.C. § 1635.[58]

Second, even if 15 U.S.C. § 1635 were to apply to her contract, Ms. Reid's rescission claim is untimely. Subsection (a) of that statute reads, in relevant part, that, "the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction. . . ."[59] Because Ms. Reid signed the contract for the purchase of her car in August of 2022, thereby "consummating" it, her rescission claim would have had to have been made in that month. Her claim in this case is clearly years too late.

### 3.    Other claims under TILA

Ms. Reid has attempted to assert other claims under TILA and its associated regulations. She apparently asserts that the defendants failed to accurately disclose the amount of her finance charge.[60] She also evidently claims that the defendants failed properly to account for her $2500.00 downpayment in calculating her loan balance.[61] In the course of making these claims, she identifies several statutory sections and regulations, including the disclosure provisions of TILA itself and the companion regulation at 12 C.F.R. § 1026, otherwise known as "Regulation Z."

---

[58]     *See Singletary v. Sunbit Now, LLC*, No. 24-cv-877 (JAG), 2025 WL 2427165, at *5 (E.D. Va. Aug. 22, 2025) (dismissing claim that 15 U.S.C. § 1635 is applicable to finance agreement for auto repairs, absent any security interest in home of *pro se* plaintiff).

[59]     15 U.S.C. § 1635(a).

[60]     Complaint, Docket No. 1, at p. 17.

[61]     Complaint, Docket No. 1, at p. 17 (May 21 letter to Seaview and Mr. Lokay, alleging that "you were given a cash downpayment of $2500.00 [but] you have rolled my downpayment into my finance charge" and thus "fraudulently [took] my cash downpayment for financial gain").

Ms. Reid is correct that TILA contains strong disclosure-related protections for consumers. "TILA was enacted in 1968 to protect consumers against inaccurate and unfair credit billing and credit card practices and promote the informed use of credit by assuring a meaningful disclosure of credit terms. . . . TILA promotes this goal largely by imposing mandatory disclosure requirements on those who extend credit to consumers in the American market."[62] "In general, TILA requires creditors to provide borrowers clear, conspicuous, and accurate disclosures of the loan terms and other material information. . . . [t]he required material disclosures include, but are not limited to, the amount financed, the annual percentage rate, the finance charge, the total of payments, and the payment schedule."[63] Subsection (2)(A) of 15 U.S.C. § 1638 sets forth how the "amount financed" shall be computed, including charges defined by 15 U.S.C. § 1605.

Ms. Reid is also correct that federal regulations supplement the TILA statute and provide additional detail on a creditor's disclosure obligations. For example, 12 C.F.R. § 1026.18(d) requires the creditor to "disclose the finance charge as a dollar amount, using the term finance charge" and include a "brief description such as 'the dollar amount the credit will cost you.'"[64] Subsection (c) of that regulation requires the creditor to provide "a separate written itemization" of the amounts that are being financed, including the amount of any funds being "distributed directly to the consumer" and "any amounts paid to other persons on the consumer's behalf."[65] To

---

[62]    *Strubel v. Comenity Bank*, 842 F.3d 181, 186 (2d Cir. 2016) (citations omitted; internal quotation marks omitted).

[63]    *Catalano v. MarineMax*, 690 F. Supp. 3d 123, 136 (E.D.N.Y. 2023) (citations omitted; internal quotation marks omitted).

[64]    12 C.F.R. § 1026.18(d).

[65]    12 C.F.R. § 1026.18(c). More specifically, the regulation provides that the creditor must identify persons who receive any funds under the terms of the agreement, and that the "following payees may be described using generic or other general terms and need not be further identified: public officials or government agencies, credit reporting agencies, appraisers, and insurance companies." 12 C.F.R. § 1026.18(c)(iii). The contract in this case does include several such fees;

cite another example, 12 C.F.R. § 1026.18(e) states that the annual percentage rate must be specifically disclosed, using that terminology, and that it must be accompanied by a "brief description such as 'the cost of your credit as a yearly rate.'"[66]  12 C.F.R. § 226.17 adds that "the terms 'finance charge' and 'annual percentage rate,' when required to be disclosed under § 226.18 (d) and (e) together with a corresponding amount or percentage rate, shall be more conspicuous than any other disclosure, except the creditor's identity under § 226.18(a)."  And 12 C.F.R. § 226.4(b)(7) provides examples of finance charges, including: "Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction."  Creditors are also required to make disclosures "clearly and conspicuously in writing, in a form that the consumer may keep."  12 C.F.R. § 226.17.

Federal law also requires certain disclosures about insurance sold in connection with a consumer credit transaction.  For example, 15 U.S.C. §1605(b) provides that certain insurance premiums, "written in connection with any consumer credit transaction," shall be included in the finance charges, "unless (1) the coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit, and this fact is clearly disclosed in writing to the person applying for or obtaining the extension of credit; and (2) in order to obtain the insurance in connection with the extension of credit, the person to whom the credit is extended must give specific affirmative written indication of his desire to do so after written disclosure to him of the cost thereof."[67]

---

*see* footnote 66 of this opinion; but Ms. Reid has not plausibly alleged that any of them were improper.

[66]     12 C.F.R. § 1026.18(e).

[67]     15 U.S.C. §1605(b).  This section further provides for exceptions to the calculation of finance charges, exempting the following items: "(1) Fees or premiums for title examination, title insurance, or similar purposes.  (2) Fees for preparation of loan-related documents.  (3) Escrows for future payments of taxes and insurance.  (4) Fees for notarizing deeds and other documents.

In this case, however, Ms. Reid has not plausibly alleged any violations of these disclosure requirements. She attached a copy of her installment contract to her complaint, and a review of that contract fails to support any of her claims of non-disclosure, even assuming the truth of her non-conclusory factual allegations.

To begin with, it appears that the finance charge disclosures complied with the statutes and regulations. The installment contract has a section clearly labeled "**TRUTH IN LENDING DISCLOSURES**."[68] This section has a box, bordered by a boldened black line, with two smaller boxes. The first of these bold boxes is labeled "**ANNUAL PERCENTAGE RATE**." In smaller but still conspicuous type, below but within the same box, it reads: "The cost of Your credit as a yearly rate." The annual percentage rate for the loan is clearly labeled as 18.99%.[69] The second of the bold boxes is labeled "**FINANCE CHARGE**" and, in smaller but still fully legible type immediately below, reads: "The dollar amount the credit will cost You." The amount in this box is $19,813.08.[70] The remaining first row boxes contain the "**Amount Financed**," ($29,021.64), the "**Total of Payments**" ($48,834.72) and the "**Total Sale Price**" ("The total cost of Your purchase on credit, including Your down payment of $2500.00 is $51,334.72").[71] Below that, the "**Payment Schedule**" informed Ms. Reid that, in signing the contract, she agreed to make seventy-

---

(5) Appraisal fees, including fees related to any pest infestation or flood hazard inspections conducted prior to closing. (6) Credit reports." 15 U.S.C. § 1605(e). Line 5C of the contract (Complaint, Docket No. 1, at p. 3) contained charges for "cost of fees paid to public officials for perfecting, releasing, or satisfying a security interest" in the amount of 10.00. Line 5D of the same document refers to a charge of $201.00 for "cost of fees paid to public officials for certificate of title, license and registration." Line 5F provides for "optional gap protection" in the amount of $1,321.00 to be paid to Phoenix American Administrators, Inc. And Line 5G of the contract itemizes a "doc fee" of $399.00, to be paid to "the seller." Ms. Reid has not alleged that any of these specific fees were assessed in violation of 15 U.S.C. § 1605(e).

[68]      Complaint, Docket No. 1, at p. 2.
[69]      Complaint, Docket No. 1, at p. 2.
[70]      Complaint, Docket No. 1, at p. 2.
[71]      Complaint, Docket No. 1, at p. 2.

two monthly payments of $678.26, beginning on September 11, 2022.[72]  Ms. Reid's complaint does not plausibly explain how these disclosures fail to comply with any statute or regulation.

The GAP insurance disclosures likewise appear to comply with the law.  The second page of the contract has a box with the header, "**GAP Protection: Optional Guaranteed Auto Protection (GAP) is not required to obtain credit**."[73]  The box further explains,  "GAP protection will not be provided under this Contract unless You sign for it below and agree to pay the additional cost shown below and on Line 5F of the ITEMIZATION OF AMOUNT FINANCED.  You may obtain optional GAP protection from a person of Your choice that is authorized to sell such coverage and is acceptable to Us.  The [GAP] contract issued by the provider of the protection will describe the terms and conditions of coverage in further detail.  If You want GAP protection, sign below."[74]  The contract lists the cost of the GAP insurance as $1,321.00 and the term as seventy-two months, provided by Phoenix American Administrators, Inc.[75]  Ms. Reid's electronic signature appears in the GAP insurance box, and also on the bottom of each of the first two pages of the contract.[76]

If this were not enough, there is more.  Indeed, another entire page of the contract is devoted to the issue of GAP coverage.  On that page, Ms. Reid agreed that "Guaranteed Asset/Auto Protection (GAP) has been explained to me in conjunction with the purchase of my car on credit. After hearing the explanation, **I WOULD** like to purchase GAP Coverage in accordance with the terms and conditions of the insurance or waiver certificate provided to me from the dealer."[77]  The

---

[72]     Complaint, Docket No. 1, at p. 2.
[73]     Complaint, Docket No. 1, at p. 3.
[74]     Complaint, Docket No. 1, at p. 3.
[75]     Complaint, Docket No. 1, at p. 3.
[76]     Complaint, Docket No. 1, at pp. 1, 2.
[77]     Complaint, Docket No. 1, at p. 8.

next paragraph states, "**NOTICE: GAP** is **VOLUNTARY** and **NOT REQUIRED** in order to buy this car on credit.  **GAP IS NOT** automobile insurance and therefore does not provide general liability or property damage coverage and does not fulfill the requirements of any financial responsibility law."  This disclosure placed the contract in compliance with "Regulation Z," 12 C.F.R. § 225.4(d)(3)(1), which requires "(1) that the GAP insurance not be mandatory, and (2) that its non-mandatory nature be disclosed in writing."[78]

Ms. Reid has not plausibly alleged that Seaview violated these or any other truth-in-lending requirements.  In other words, although Ms. Reid has alleged in conclusory fashion that various statutes have been violated, she has not identified any plausible, specific way in which the contract between herself and Seaview did not meet the requirements of TILA or the associated regulations.

### 4.    *"Commingling" of funds*

Ms. Reid also alleges that Seaview violated 20 U.S.C. § 1078, which concerns "[c]ommingling of [f]unds."[79]  She reads that law as providing that "there shall not be any cash involved when there is a consumer credit transaction."[80]  This claim deserves little discussion, because 20 U.S.C. § 1078 pertains to federal payments to reduce student interest costs under the Federal Family Education Loan Program, which supports the funding of higher education.  This case has nothing to do with education financing, and accordingly, Ms. Reid has not alleged any facts that would support a claim under 20 U.S.C. § 1078.

---

[78]    *Munoz v. JLO Auto., Inc.*, No. 3:19-cv-01793 (MPS), 2020 WL 6607789, at *2 (D. Conn. Nov. 12, 2020).
[79]    Complaint, Docket No. 1, at p. 17.
[80]    Complaint, Docket No. 1, at p. 17.

### 5.    *Violations of the Fair Debt Collection Practices Act*

Ms. Reid also alleges that Seaview violated 15 U.S.C. § 1662.[81]  That statute is part of the Fair Debt Collection Practices Act ("FDCPA").  It provides, in full, that "[n]o advertisement to aid, promote, or assist directly or indirectly any extension of consumer credit may state (1) that a specific periodic consumer credit amount or installment amount can be arranged, unless the creditor usually and customarily arranges credit payments or installments for that period and in that amount; [and] (2) that a specified downpayment is required in connection with any extension of consumer credit, unless the creditor usually and customarily arranges downpayments in that amount."

Here too, however, Ms. Reid's factual allegations do not support her legal claim.  The May 26 letter asserts that Ms. Reid was "informed that a down payment of $2500.00 was needed for me to drive off the lot."[82]  The statute, however, does not prohibit a consumer creditor from requiring a downpayment.  Rather, it concerns the *advertising* of downpayments.[83]  Ms. Reid has alleged no facts about how, or even whether, Seaview *advertised* the Hyundai Sonata or the financial arrangements that would be required to buy it.  She therefore has not stated a plausible claim under 15 U.S.C. § 1662.[84]

### 6.    *False and deceptive information*

Ms. Reid also alleges that Seaview gave her "false and deceptive information" during the transaction, specifically by informing her that "a down payment of $2,500.00 was needed for me

---

[81]    Complaint, Docket No. 1, p. 17.
[82]    Complaint, Docket No. 1, p. 18.
[83]    *Anderson v. Carvana*, 4:21-cv-1173 (HEA), 2022 WL 13948296, at *2 (E.D. Mo. Oct. 24, 2022) ("This statute does not prohibit a down payment. . . . Clearly, the statute relates to advertisements, not downpayments.") (Citation omitted).
[84]    *Anderson*, 2022 WL 13948296, at *2 (dismissing similar claim).

to drive off the lot."[85]  Ms. Reid also alleges a "clear act of fraud" on line 7 of the contract, which states the "amount financed" as $29.021.64.[86]

Here again, however, Ms. Reid's claim is tripped up by the very contract that she placed before the Court.  Put simply, it appears that Ms. Reid is misinterpreting the contract that she signed.  She alleges that the sum of $29,021.64 was erroneous because the "total price" of the car was "27,800.00" which, combined with the down payment of $2500.00, "rolled" the down payment into the finance charge.[87]  But her calculation does not account for the sales tax ($1790.64) or the various fees itemized on the "**ITEMIZATION OF AMOUNT FINANCED**" page of the contract.[88]  Thus, although the cash price of the vehicle was indeed $27,800.00, the amount financed as an unpaid balance was $29,021.64 *after* the deduction of her down payment of $2500 and the addition of taxes, the cost of the GAP protection plan, and the other fees that were assessed by Seaview as components of the sale.  Given these facts, Ms. Reid has not pled a plausible claim that Seaview defrauded her with respect to her downpayment, the amount financed, or any other material term of the contract.

### C.    Other Claims Not Expressly Identified by Ms. Reid

Even though none of Ms. Reid's purported claims survive step two of the IFP analysis, "the Court is obliged to consider whether the plaintiff's factual allegations add up to some plausible claim that she did not think of."[89]  I have carefully reviewed the complaint, and two possibilities suggest themselves.  The first would be to read Ms. Reid's complaint as attempting a common-

---

[85]    Complaint, Docket No. 1, at p. 18.
[86]    Complaint, Docket No. 1, at p. 17.
[87]    Complaint, Docket No. 1, at p. 17.
[88]    Complaint, Docket No. 1, at p. 3.
[89]    *Murphy*, 2024 WL 2864218, at *3; *see also Phillips*, 408 F.3d at 130 (noting that *pro se* litigants "cannot be expected to know all of the legal theories on which they might ultimately recover").

law fraud or fraudulent misrepresentation claim.  The second would be to construe the complaint

as a petition to compel arbitration under 9 U.S.C. § 4.  These implied claims are, however, no more

successful than Ms. Reid's express claims.

### 1.     Common-law fraud or misrepresentation

Much of Ms. Reid's complaint can—with some effort—be distilled down to the basics of

common-law fraud or misrepresentation.  She plainly believes that Seaview misrepresented the

terms of the contract and/or misled her when she agreed to purchase her 2019 Hyundai Sonata.

Such a claim could conceivably be expressed in one of three common-law causes of action—

innocent misrepresentation,[90] negligent misrepresentation, or fraud.[91]

The problem, though, is that this Court would not have jurisdiction over such a claim.

Federal courts have limited jurisdiction, which means they cannot hear just any case.[92]  Leaving

aside a few types that are not relevant here, a federal court can typically hear and decide only three

---

[90]     To prove a claim of innocent misrepresentation, a plaintiff must establish: (1) a representation of material fact; (2) made for the purpose of inducing the plaintiff to act; (3) which representation is untrue, and as to which the declarant has the means of knowing, ought to know, or has the duty to know the truth; (4) justifiable reliance by the plaintiff on the representation made by the defendant; and (5) damages.  *Johnnycake Mountain Assocs. v. Ochs*, 104 Conn. App. 194, 204 n.13 (2007), *cert. denied*, 286 Conn. 906 (2008).  Notably, proving a claim of innocent misrepresentation does not require a showing of intent, fault, or a failure of reasonable care.  *See Sturm v. Harb Dev., LLC*, 298 Conn. 124, 144 (2010).

[91]     "Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  *Coppola Const. Co. v. Hoffman Enters. Ltd. P'ship*, 309 Conn. 342, 351–52 (2013) (internal quotation marks omitted).  Relatedly, Ms. Reid could conceivably plead a claim of fraudulent misrepresentation. "[A]t common law, fraudulent misrepresentation and intentional misrepresentation are the same tort."  *Kramer v. Petisi*, 285 Conn. 674, 684 n.9 (2008).  "In contrast to a negligent representation, [a] fraudulent representation . . . is one that is knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it."  *Kramer*, 285 Conn. 684 n.9 (internal quotation marks omitted).  Again, though, Ms. Reid has not actually plead facts to support either negligent or fraudulent misrepresentation as of this point in time.

[92]     *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

types of cases: (1) those that "aris[e] under the Constitution, laws, or treaties of the United States" – so-called "federal question" jurisdiction under 28 U.S.C. § 1331; (2) disputes between citizens of different states, where the amount in controversy exceeds $75,000 – "diversity jurisdiction" under 28 U.S.C. § 1332; and, under certain circumstances, (3) other claims that are "so related" to an "original jurisdiction" claim that they "form part of the same case or controversy under Article III of the United States Constitution" – "supplemental jurisdiction" under 28 U.S.C. § 1367(a). And when a claim does not fall within one of these types, a federal court typically cannot hear it, even if it was drafted by a *pro se* plaintiff.[93] Here, any potential innocent (or fraudulent) misrepresentation claim would be based on state law, not federal law, and it would therefore not trigger "federal question jurisdiction."[94] Moreover, Ms. Reid is a Connecticut citizen who has sued other Connecticut citizens over a $51,334.72 automobile purchase contract, and her claims would therefore not trigger federal "diversity jurisdiction." And "supplemental jurisdiction" is typically unavailable where, as here, all the federal law claims are subject to dismissal.[95] In sum, any potential common-law claim—if, in fact, Ms. Reid does have such a claim—would simply be out of the reach of this Court's jurisdiction.

---

[93]     *Hamm*, 2023 WL 2867070, at *2 (noting that, while *pro se* "complaints are reviewed liberally, that liberality does not stretch so far as to cause a court to hear a case that is outside its jurisdiction").

[94]     *See, e.g., In re Standard & Poor's Rating Agency Litig.*, 23 F. Supp. 3d 378, 395 (S.D.N.Y. 2014) (remanding common-law fraud claims to state court for lack of federal question jurisdiction).

[95]     By invoking various federal statutes (as discussed previously in this opinion), Ms. Reid effectively sought federal question jurisdiction for those claims. None of them were plausible, however. "Under 28 U.S.C. § 1367(a), district courts have 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.' While the district court may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction, *see* 28 U.S.C. § 1367(c)(3), it cannot exercise supplemental jurisdiction unless there is first a proper basis for

Even if the Court were to look beyond the jurisdictional problem, Ms. Reid's claim would still fail. Pleading any form of misrepresentation still must necessarily involve demonstrating specific misrepresentations that the defendants knew or should have known were false and that Ms. Reid relied upon.[96]  Negligent misrepresentation, for example, requires showing that (1) the defendant made a misrepresentation of fact; (2) that the defendant knew or should have known was false; and (3) that the plaintiff reasonably relied upon that misrepresentation; and (4) suffered financial harm as a result.[97]  Ms. Reid has not alleged any specific statements made by any employee of Seaview—much less any misrepresentations—and she has not alleged that she relied upon any such statements to her detriment.[98]

### 2.    *Petition to compel arbitration*

Ms. Reid suggests that she would rather arbitrate her claims than pursue them in federal court, and that she only came to federal court when Seaview failed to respond to her arbitration demand. She sent her May 21 letter "in accordance to [the contract's] arbitration clause,"[99] and when she brought this suit, she complained that she had "attempted to seek remedy through arbitration" but "was disrespected and ignored."[100]  She says that the defendants "refused to acknowledge [her] claim or respond to [her] notices."[101]  It is therefore possible to construe her complaint as requesting a court order directing the defendants to arbitrate with her.

---

original federal jurisdiction." *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996) (quoting *Cushing v. Moore,* 970 F.2d 1103, 1106 (2d Cir. 1992).

[96]    *Coppola Const. Co.*, 309 Conn. 351–52; *Kramer*, 285 Conn. 684 n.9; *Johnnycake Mountain Assocs.*, 104 Conn. App. 204 n.13.

[97]    *Mumma v. Pathway Vet All., LLC*, 648 F. Supp. 3d 373, 397 (D. Conn. 2023).

[98]    Again, simply stating in conclusory fashion is not enough here: Seaview made "false and deceptive" statements is a conclusory allegation because it does not specify exactly what statements are supposed to "count" as misrepresentations.

[99]    Complaint, Docket No. 1, at p. 17.

[100]    Complaint, Docket No. 1, at p. 1.

[101]    Complaint, Docket No. 1, at p. 1.

Federal law provides that, when one party to an arbitration agreement wrongfully refuses to arbitrate, the other may come to court for an order commanding him to do so. Specifically, a law known as 9 U.S.C. § 4 provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28 . . . of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."[102] When a party files such a petition, the court's task is typically limited to determining two issues: (1) "whether a valid agreement or obligation to arbitrate exists," and (2) "whether one party to the agreement has failed, neglected or refused to arbitrate, in whole or in part."[103] Put simply, arbitration cannot be compelled under Section 4 unless a party can demonstrate that the other side has refused to arbitrate, despite the fact that there is a valid, enforceable arbitration agreement.[104]

Assuming the truth of Ms. Reid's factual allegations, there does appear to be a valid arbitration agreement in this case. She provided a copy of the contract between herself and Seaview for the purchase of the 2019 Hyundai Sonata, and one full page of that contract is devoted to arbitration.[105] The clause requires arbitration of any "Dispute," and it broadly defines "Dispute" as "any controversy or claim between You and Us arising out of or in any way related to this Contract."[106] Assuming the authenticity of this copy of the contract, it would seem that Ms. Reid

---

[102]    9 U.S.C. § 4.

[103]    *Hartford Acc. & Indem. Co. v. Equitas Reinsurance Ltd.*, 200 F. Supp. 2d 102, 108 (D. Conn. 2002) (internal quotation marks omitted).

[104]    9 U.S.C. § 4; *see also Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 725 F.2d 192, 195 (2d Cir. 1984).

[105]    Complaint, Docket No. 1, at p. 6.

[106]    Complaint, Docket No. 1, at p. 6.

had an arbitration agreement, and that her claims—however ill-defined they may yet be—are within the agreement's scope.

The problem, however, is that her complaint does not plausibly allege a refusal to arbitrate by either defendant.  As noted above, at the same time it entered the contract with Ms. Reid, Seaview assigned the contract to Credit Acceptance Corporation.[107]  The arbitration clause required Ms. Reid to begin the dispute resolution process by mailing a "Dispute Notice" *to Credit Acceptance Corporation*, not to Seaview or its employee.[108]  Thus, the fact that Seaview did not respond to Ms. Reid's letters is not itself a wrongful refusal to arbitrate.  Because Ms. Reid did not follow the requirement of mailing a written notice of dispute to Credit Acceptance Corporation, her complaint does not plausibly allege a refusal to arbitrate.  Accordingly, even if this Court had jurisdiction over a petition for an order compelling arbitration—and it is not clear that it does, for the reasons described in Section II.C.1 above—Ms. Reid's complaint does not plausibly allege a basis for giving her that order.

## III.    CONCLUSION

For the reasons set forth in Section I above, Ms. Reid's motion for leave to proceed *in forma pauperis*[109] is granted, and she is excused from paying the $405.00 in filing and administrative fees that are required of most other plaintiffs.  But for the reasons set forth in Section II, I recommend that Judge Dooley dismiss Ms. Reid's complaint.  All the claims explicitly or implicitly attempted in the complaint either fail to properly invoke the Court's jurisdiction, or fail to state a claim on which relief can be granted.

---

[107]    Complaint, Docket No. 1, at p. 5.
[108]    Complaint, Docket No. 1, at p. 6.
[109]    IFP Motion, Docket No. 2.

I further recommend, however, that the dismissal be "without prejudice." This means that, if Judge Dooley accepts my recommendation and dismisses the initial complaint, Ms. Reid could try to fix the defects identified in this recommended ruling with an amended complaint.[110] There may be no cure for those defects, but *pro se* plaintiffs are usually permitted at least one try.[111]

Section II of this document is a recommended ruling by a Magistrate Judge.[112] **If Ms. Reid wishes to object to my recommendation, she must file that objection with the Clerk of the Court by December 29, 2025.**[113] If she fails to file a timely objection, her failure "operates as a waiver of any further judicial review[.]"[114] In particular, failure to file a timely objection operates as a waiver of the right to seek appellate review in the Court of Appeals.[115]

*/s/ Thomas O. Farrish*
_____
Hon. Thomas O. Farrish
United States Magistrate Judge

---

[110]    Or she could, of course, serve an arbitration notice on Credit Acceptance Corporation and have her claims heard in arbitration, as she seems to prefer.

[111]    *See*, *e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (observing that *pro se* plaintiffs are typically permitted "leave to amend at least once").

[112]    Fed. R. Civ. P. 72(b)(1); D. Conn. L. Civ. R. 72.1(C).

[113]    *See* Fed. R. Civ. P. 72(b)(2) (stating that objections to magistrate judge recommendations shall be filed within fourteen days); D. Conn. L. Civ. R. 72.2(a) (adding five days for litigants who, like Ms. Reid, will "receiv[e] notice of an order or recommended ruling from the Clerk by mail"); *see also* Fed. R. Civ. P. 6(a)(1)(C) (explaining how time is calculated under the Federal Rules of Civil Procedure and that when the final day for a deadline falls on a Sunday, as it does here, the "period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday").

[114]    *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

[115]    *Small*, 892 F.2d at 16; *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6; *see also Impala v. U.S. Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order).